**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x
UNITED STATES OF AMERICA,

                Plaintiff,

                                             **MEMORANDUM & ORDER**
       -against-                            12-CR-586-02 (OEM)

AKEEM MONSALVATGE,

                Defendant.

------------------------------------------------------------------x
ORELIA E. MERCHANT, United States District Judge:

       Defendant Akeem Monsalvatge ("Defendant" or "Monsalvatge") is currently serving a reduced sentence of 17 years. *See* Memorandum & Order Reducing Sentence as to Akeem Monsalvatge ("Reduction Order"), ECF 284. Over ten years ago, Monsalvatge, along with others, committed two armed robberies of two different Pay-O-Matic check cashing stores in Queens, New York. One robbery occurred in 2010 and the other in 2012. During the commission of each of the robberies, Monsalvatge brandished a firearm. Monsalvatge was charged with and convicted of two counts of Hobbs Act robbery and conspiracy to commit the same in violation of 18 U.S.C. § 1951(a). Monsalvatge was also convicted of two counts of federal firearms offenses in violation of 18 U.S.C. § 924(c)(1)(A)(ii). In 2014, the Honorable Raymond J. Dearie ("Judge Dearie"), who presided over the trial of Monsalvatge and his co-defendants, sentenced Monsalvatge to a combined custodial term of 32 years and 1 day. *See* Judgment, ECF 153. Nearly two years ago, on October 24, 2022, Judge Dearie granted Monsalvatge's first motion for sentence reduction under 18 U.S.C. § 3582(c), reducing his sentence from 32 years and 1 day to 17 years based on changes to the sentencing law and other factors. *See* Reduction Order.

       Before the Court is Monsalvatge's fully briefed motion for a second sentence reduction to time served, or in the alternative, probation with or without home confinement. Motion Seeking

1

Relief Pursuant to 18 U.S.C. § 3582(c) and Amendment 821 ("Second Reduction Mot."), ECF 296; Government Letter in Opposition ("Gov't Opp."), ECF 297-1 (filed under seal); Monsalvatge Reply, ECF 298.

For the following reasons Monsalvatge's motion is denied.

## BACKGROUND[1]

### A.    The Two Pay-O-Matic Robberies and Criminal Proceedings

In the early hours of February 24, 2010, Monsalvatge and two co-defendants, Edward Byam and Derrick Dunkley robbed a Pay-O-Matic check cashing store on Rockaway Boulevard in Queens, New York.  *See* PSR ¶¶ 2-4, 8-9.  The trio was armed with handguns and wearing cloth masks.  *Id.*  Monsalvatge came in through the lobby brandishing a handgun while Dunkley managed to gain entry to the secure teller area by "crashing" through the ceiling.  *See* PSR ¶¶ 9, 32.  Dunkley tried to let Monsalvatge into the secure teller area, but mistakenly locked himself and Monsalvatge out of the area.  *Id.* at ¶ 9.  They eventually gained entrance through the front door, and for approximately 15 minutes, Monsalvatge was the only defendant inside the store where he "rested a gun on the countertop so that it was pointed at [the teller] and said 'do not make any move' and 'I'll kill you.'"  *Id.* at ¶ 9.  For the most part, Byam acted as a lookout during the 2010 robbery.  *Id.* at ¶ 9.  However, at some point Byam entered the lobby of the store and exchanged handguns with Monsalvatge who then pushed a smaller handgun through the teller window to Dunkley, who used it to threaten the teller.  *Id.*; *Monsalvatge*, 850 F.3d at 486.  The trio stole over $44,039.73 in cash from the safe.  *Monsalvatge*, 850 F.3d at 486.

---

[1]    The following facts are taken from, among other sources, the Presentence Report ("PSR"), ECF 130, and Judge Dearie's October 24, 2022's Reduction Order, ECF 284. A fulsome review of the facts and procedural history of this case can be found in the Judge Dearie's order denying the defendants' respective § 2255 habeas petitions ("Habeas Order"), ECF 266, as well as the Second Circuit's decision in *United States v. Monsalvatge*, 850 F.3d 483, 485-87 (2d Cir. 2017) (direct appeal of convictions).

The trio's second robbery occurred two years later in February of 2012.  *See* PSR ¶¶ 11-12.  Like before, the group targeted another Pay-O-Matic check cashing store in Queens.  *Id.*  The group gained entry to this Pay-O-Matic by first approaching a teller ("Teller #1") in the parking lot as she arrived at work, and the trio disguised themselves as NYPD officers by wearing real NYPD jackets and NYPD detective-style badges on neck hangers purchased by Dunkley.  *Id.*  All three also donned professional Hollywood-grade special effects masks.  *Id*. at ¶ 12.  In the parking lot, one of the defendants showed Teller #1 several photographs of houses, including one photograph of her own house, at which point Teller #1 understood that the situation was in fact a "hold up."  *Monsalvatge*, 850 F.3d at 487.  Teller #1 then convinced the overnight teller inside the Pay-O-Matic ("Teller #2") to let her and the defendants all inside the secure teller area, which had to be opened from the inside.  *See* PSR ¶ 12.  "Inside the teller area, one robber emptied a safe and put the money into a black bag.  The other robber demanded at gunpoint that [Teller #1] and [Teller #2] lie down on the floor."  *Monsalvatge*, 850 F.3d at 487.  "The armed robber emptied the teller drawers and splashed the teller counter with a liquid that smelled like bleach.  The three robbers then left the Pay-O-Matic with the cash, driving off in the SUV.  In total, the trio stole $200,755.89."  *Id.* (footnote omitted); PSR ¶ 12.

Monsalvatge was arrested by ATF agents as he was leaving his residence in Queens on August 21, 2012.  On January 4, 2013, a grand jury indicted Monsalvatge, Byam, and Dunkley, charging each of them in a five-count superseding indictment (the "Superseding Indictment") with Hobbs Act robbery conspiracy, in violation of 18 U.S.C. § 1951(a) (Count One); Hobbs Act robbery on February 24, 2010, in violation of 18 U.S.C § 1951(a) (Count Two); unlawful use of a firearm in a crime of violence in connection with the February 24, 2010 robbery, in violation of 18 U.S.C. § 924(c)(1)(A)(ii) (Count Three); Hobbs Act robbery on February 14, 2012, in violation

of 18 U.S.C § 1951(a) (Count Four); and unlawful use of a firearm in a crime of violence in connection with the February 14, 2012 robbery, in violation of 18 U.S.C. § 924(c)(1)(A)(ii) (Count Five).  *See* Superseding Indictment, ECF 16; PSR ¶¶ 1-7.

Monsalvatge, Byam, and Dunkley were tried together at a jury trial that began July 30, 2013, with Judge Dearie presiding.  On August 9, 2013, the jury convicted each of the three defendants on all five counts as charged in the Superseding Indictment.

### B.     Monsalvatge's Original Sentence

On April 4, 2014, Judge Dearie sentenced Monsalvatge to a total of 32 years of imprisonment and 1 day.  *See* PSR at 1; Minute Entry dated 4/14/2014 for Sentencing of Akeem Monsalvatge ("Monsalvatge Sentence"), ECF 152.

Under the version of § 924(c) in effect at the time of his sentencing, Monsalvatge's conviction of two § 924(c) counts mandated minimum consecutive custody terms of seven and 25 years, respectively.  *See* PSR at Comments; see *id.* ¶¶ 24, 51-53, 99.  Monsalvatge was sentenced to the statutory minimum for each § 924(c) count (Counts Three and Five), to run consecutively with all counts.  *Id.*

In light of the severity of the mandatory penalty for Monsalvatge's § 924(c) convictions, Judge Dearie sentenced Monsalvatge to one day for each of the two substantive Hobbs Act robbery and the Hobbs Act conspiracy count (Counts One, Two, and Four)— the minimum sentence permitted by law.  Reduction Order, ECF 284.

### C.     Appeals and Monsalvatge's First Sentence Reduction

All three defendants filed direct appeals of their convictions.  *See United States v. Monsalvatge*, 689 F. App'x 680, 682 (2d Cir. 2017) (summary order).  On May 4, 2017, prior to the enactment of the First Step Act, the Second Circuit affirmed both Monsalvatge and Byam's

convictions in their entirety. However, finding the evidence insufficient as to Dunkley's participation in the 2010 robbery, the Second Circuit reversed Dunkley's conviction as to Count Two (for the 2010 Hobbs Act robbery) and Count Three (the accompanying 2010 § 924(c) firearms count) and remanded the case for resentencing. *Id.* at 682. At Dunkley's resentencing, Judge Dearie imposed a total custodial term of 108 months, or 9 years. Dunkley Resentencing Minute Entry, ECF 220. All three defendants subsequently filed § 2254 habeas petitions which were denied in their entirety by Judge Dearie on March 31, 2022. *See* ECF 266, 267, 268. After the passage of the First Step Act, all three defendants also moved for sentence reductions. *See* ECF 237 (Dunkley, filed 5/9/2019); ECF 274 (Monsalvatge, filed 5/19/2022); ECF 283 (Byam, filed 10/17/2022). On October 22, 2022, Judge Dearie granted Monsalvatge's motion, reducing his sentence from 32 years to 17 years. *See* Reduction Order at 1. Among other reasons, Judge Dearie opined that, given the change in § 924(c) provided by the First Step Act, "Monsalvatge's sentence and the disparity between the mandatory minimum he is now serving and the mandatory minimum he would face if sentenced today constitute extraordinary and compelling circumstances warranting relief." *Id.* at 6.

### D.    Monsalvatge's Second Motion for Sentence Reduction

Monsalvatge, now 49 years old, seeks a second sentence reduction. *See* Second Reduction Mot., ECF No. 296. He has been incarcerated for more than a decade, and the Bureau of Prisons estimates he will be released on February 11, 2027. *See* BOP Inmate Locator, https://www.bop.gov/inmateloc/ (last accessed November 8, 2024). Among supplemental documents in support of his second sentence reduction motion, Monsalvatge filed a copy of his certification of completion of an inmate suicide watch companion program and his recent progress report. *See* ECF 299, 300.

**LEGAL STANDARD**

A court engages in a tripartite analysis when evaluating a "compassionate release" or sentence reduction motion brought pursuant to the First Step Act. *See Birkett*, 2023 WL 4274683, at *2 ("whether a defendant is entitled to compassionate release under the First Step Act requires a three-part analysis."); *United States v. Rivers*, 03-CR-01120 (FB), 2023 WL 5978094, at *1 (E.D.N.Y. Sept. 14, 2023) (explaining defendant "must satisfy three requirements" in order to qualify for a "reduction pursuant to the FSA").

First, a court must determine whether the movant has "satis[fied his] administrative burden" at the custodial level before moving in federal court. *Birkett*, 2023 WL 4274683, at *2; 18 U.S.C. § 3582(c)(1)(A). Second, a court must determine whether "extraordinary and compelling reasons warrant [] a reduction" of the defendant's sentence. 18 U.S.C. § 3582(c)(1)(A)(i); *accord United States v. Wallace*, No. 23-6283, 2023 WL 7986443, at *2 (2d Cir. Nov. 17, 2023). However, the presence of "extraordinary and compelling circumstances" is not, in itself, enough. *See Brooker*, 976 F.3d at 237-38 (citing 28 U.S.C. 994(t)). Third, a court must consider the sentencing factors 18 U.S.C. § 3553(a) (the "§ 3553(a) factors") and any applicable policy statements issued by the United States Sentencing Commission (the "Sentencing Commission"). 18 U.S.C. § 3582(c)(2); *Birkett*, 2023 WL 4274683, at *2. The Court addresses each part of the analysis in turn.

**DISCUSSION**

**A.    Administrative Exhaustion**

The Government argues that Monsalvatge's motion should be denied because he has failed to exhaust his administrative remedies as required by 18 U.S.C. § 3582(c)(1)(A). *See* Gov't Opp. The Government filed BOP records showing that the warden received Monsalvatge's request for

reduction in sentence on February 14, 2024, and denied his request on March 28, 2024.  The Government also asserts that, as of June 14, 2024, Monsalvatge had failed to appeal the denial of his request to the appropriate regional director, but instead that Monsalvatge filed this present motion on May 23, 2024, without first exhausting his administrative remedies including an appeal.  Monsalvatge argues that the statute only requires a defendant to wait the 30-day period from when the warden receives the request for sentence reduction before filing motion in federal court.

Section 3582(c)(1)(A) provides as follows:

[T]he Court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier . . . may reduce the term of imprisonment . . . .

18 U.S.C. § 3582(c)(1)(A).

District courts in this circuit are split on how to interpret the statute's provision permitting an inmate to move for a sentence reduction "after ... the lapse of 30 days from the receipt" by the warden of an inmate's request for the BOP to move on his behalf for a sentence reduction.  18 U.S.C. § 3582(c)(1)(A).  Some courts in this Circuit have held that the statute's 30-day waiting period authorizes a defendant to file a motion regardless of whether the warden responds to the defendant's request for compassionate release.  Under this view, an inmate must "either . . . exhaust administrative remedies or simply . . . wait 30 days after serving his petition on the warden of his facility before filing a motion in court."  *United States v. Haney*, 454 F. Supp. 3d 316, 320 (S.D.N.Y. 2020); *see also United States v. Tavarez*, 2024 WL 4043740, at * 1 (E.D.N.Y. Sept. 4, 2024).

In *Haney*, the court explained that "the exhaustion requirement in § 3582(c)(1)(A) merely controls who—the BOP or defendant—may move for compassionate release and when such a

motion may be made.  It simply delineates the process for a party to obtain judicial review, not referring to the adjudicatory capacity of courts.  That is, § 3582(c)(1)(A) "does not speak in jurisdictional terms or refer in any way to the jurisdiction of the [federal] courts."  454 F. Supp. 3d 316, 320 (quoting *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 394 (1982)).  The court further explained that "§ 3582(c)(1)(A) does not contain an exhaustion requirement in the traditional sense.  That is, the statute does not necessarily require the moving defendant to fully litigate his claim before the agency (i.e., the BOP) before bringing his petition to court.  Rather, it requires the defendant either to exhaust administrative remedies or simply to wait 30 days after serving his petition on the warden of his facility before filing a motion in court."  *Haney*, 454 F. Supp. 3d at 321.

In *Tavarez*, the government argued that the defendant had not administratively exhausted his claim in part because he had not administratively appealed the warden's denial of his request for sentence reduction.  There, the court held that because § 3582(c)(1)(A) is a "claim-processing rule" and not a "jurisdictional limitation," it can be waived.  *Tavarez*, 2024 WL 40434740, at *1 (finding that district courts in this circuit have waived the exhaustion requirement where it would be futile or prejudicial) (citing *United States v. Johnson*, 671 F. Supp. 3d 265, 271 (E.D.N.Y. 2023)); *id.* (citing *United States v. Salemo*, No. 11-CR-65, 2021 WL 4060354, at *2 (S.D.N.Y. Sept. 7, 2021), for the holding that the exhaustion requirement is "subject to judicial waiver").

However, in other instances courts in this Circuit have found that if the BOP timely responds to a defendant's request for compassionate release, the defendant must "'satisfy the same exhaustion procedure' that applies to 'routine administrative grievances,'" which would "include[] appeals to both the appropriate Regional Director and the BOP General Counsel."  *United States*

*v. Samuels*, 2020 WL 7696004, at *3 (S.D.N.Y. Dec. 28, 2020); *see also United States v. Morales*, 2023 WL 4764054, at *2 (S.D.N.Y. July 26, 2023).

This Court finds that the administrative exhaustion requirement is non-jurisdictional. The warden's denial of Monsalvatge was well outside of the 30-day waiting period, and as such, Monsalvatge was free to file his application with this Court. *See United States v. Woodson*, 452 F. Supp. 3d 41, 33 (S.D.N.Y. Apr. 6, 2020) ("If the BOP does not act favorably on the defendant's request after 30 days, the exhaustion requirement is dispensed with and the defendant may bring his application to the Court.") Further, even if Monsalvatge's prior attempt to exhaust his administrative burden was inadequate, this Court finds that there is good reason to waive the exhaustion requirement.[2] As the *Taverez* court found, from 2020 through June 2024, the BOP Director had initiated only one successful motion for compassionate release on behalf of a defendant in the Second Circuit, while 480 defendants had successfully brought their own compassionate release motions. *See* Tavarez, 2024 WL 4043740, at *1 (citing to U.S. Sentencing Commission, Compassionate Release Data Reports, at Table 5, https://www.ussc.gov/research/data-reports/compassionate-release-data-reports.) "[G]iven the BOP's apparent unwillingness to pursue compassionate release requests, requiring [Monsalvatge]—having already received a denial from the warden—to now file an appeal before bringing this petition would be an exercise in futility." *Tavarez*, 2024 WL 4043740, at *1.

---

[2]    In the context of Monsalvatge's first motion for sentence reduction, Monsalvatge only asserted that the warden denied his request for sentence reduction, and, even though Monsalvatge had not administratively appealed that denial through BOP, the Government did not raise the issue of exhaustion then. While that did not foreclose the Government from making that argument in the context of Monsalvatge's present motion, it bears on the Court's analysis of the exhaustion requirement.

**B.**     **Whether "Extraordinary and Compelling Reasons" Exist to Warrant a Sentence Reduction**

Monsalvatge argues that extraordinary and compelling reasons warrant a reduction in his sentence to time served or, in the alternative, probation with or without home confinement. *See* Second Reduction Mot. In support, Monsalvatge makes the following arguments: (1) he has several concerns related to his health: he currently suffers from a prostate condition, he is concerned about his inability to get a colonoscopy while incarcerated, he is at risk of developing diabetes given his diagnosis with prediabetes, and he had poor living conditions during Covid-19; (2) his mother is in poor health and that he is the only person who can serve as her primary caregiver; (3) he has accumulated 450 Federal Time Credits but they have not been applied to his sentence; (4) the 2023 Amendments to the Sentencing Guidelines warrant reduction; and (5) his continued incarceration is no longer needed because he has been rehabilitated and served his punishment. *Id.* The Government opposes each of these arguments. *See* Gov't Opp.

### 1.     Monsalvatge's Medical Conditions

Monsalvatge asserts that he has "issues with his prostate" and that his urologist recommended long term care, which Monsalvatge asserts BOP has not and cannot provide; as a Black man over the age of 45, he is at risk of colon cancer but that BOP has refused to provide a colonoscopy due to costs and instead provided him a "fecal occult blood test;" his A1C hemoglobin level is 6.0 and he is prediabetic; and his condition of confinement has been exacerbated by Covid-19. Second Reduction Mot. at 3. Monsalvatge therefore argues that these conditions amount to extraordinary and compelling circumstances warranting his release. *Id.*

The Government responds that the medical records Monsalvatge attached to his motion do not support the finding that his medical issues amount to "serious physical or medical conditions" under U.S.S.G. § 1B1.13(b)(1). Gov't Opp. at 7-8. The Government argues that Monsalvatge's

10

medical records instead show that he is receiving medical care to manage his medical issues, including treatment from medical providers outside of the BOP system, for his elevated PSA levels related to his enlarged prostate and prediabetes condition. *Id.* at 8. The Government points out that the medical records in fact show that Monsalvatge's PSA levels have retreated and that he receives counseling regarding his prediabetes diagnosis. *Id.* The Government further asserts that Monsalvatge is entitled to reasonable care but not to a care of his choosing. *Id.*

The policy statement set forth in Section 1B1.13 states when a defendant's medical circumstances constitute extraordinary and compelling reasons:

> Medical Circumstances of the Defendant.—
>
> (A) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end-of-life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>
> (B) The defendant is—
>      (i) suffering from a serious physical or medical condition,
>      (ii) suffering from a serious functional or cognitive impairment, or
>      (iii) experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.
>
> (C) The defendant is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death.
>
> (D) The defendant presents the following circumstances--
>      (i) the defendant is housed at a correctional facility affected or at imminent risk of being affected by (I) an ongoing outbreak of infectious disease, or (II) an ongoing public health emergency declared by the appropriate federal, state, or local authority;
>           (ii) due to personal health risk factors and custodial status, the defendant is at increased risk of suffering severe medical complications or death as a result of exposure to the ongoing outbreak of infectious disease or the ongoing public health emergency described in clause (i); and

(iii) such risk cannot be adequately mitigated in a timely manner.

U.S.S.G. § 1B1.13(b)(1).

At this juncture, Monsalvatge has not made the necessary showing of "extraordinary and compelling" reasons regarding his stated medical conditions warranting relief. Monsalvatge does not argue that he is suffering from a terminal illness or that he contracted Covid-19 or that he is at higher risk of contracting Covid-19 because of his conditions. Rather, he argues that his medical conditions are sufficiently serious to warrant his release. But "[t]he BOP has elaborated on what qualifies as a serious physical or medical condition: It is when the defendant either has an 'incurable progressive illness or has suffered a debilitating injury from which he will not recover'; is 'completely disabled, meaning the defendant cannot carry on any self-care and is being totally confined to a bed or chair'; or is 'capable of only limited self-care and confined to a bed or chair more than 50% of waking hours.'" *United States v. Lisi*, 440 F. Supp. 3d 246, 251 (S.D.N.Y. 2020) (citation omitted). While the Court is sympathetic to the numerous medical issues that Monsalvatge has dealt with during his incarceration, his conditions fall short of the type of serious medical conditions that favor sentence reduction. Indeed, prediabetes is not "among the underlying conditions that the CDC has identified as presenting an increased risk of serious illness [and] ... do[es] not satisfy the extraordinary and compelling standard." *United States v. Cajigas*, 2020 WL 6625210, at *2 (S.D.N.Y. Nov. 11, 2020); *see United States v. Corin*, 2020 WL 5898703, at *3 (S.D.N.Y. Oct. 5, 2020) (defendant "[did] not suffer from any of the medical conditions that would cause the Court to even contemplate granting him compassionate release on medical grounds."). And a defendant's enlarged prostate and other urinary issues do not entitle him to release, particularly where BOP has provided evidence showing that the defendant is receiving adequate medical care, including prescribing medication and scheduling care at non-BOP

facilities. *United States v. Olangian*, 12-cr-798, 2024 WL 4372135, at *4 (S.D.N.Y. Oct. 2, 2024); *see United States v. Barnett*, No. 90 Cr. 913, 2021 WL 3550217, at *3 (S.D.N.Y. Aug. 10, 2021) (finding that defendant's diabetes, hypertension, glaucoma, and an enlarged prostate did not merit compassionate release), *aff'd*, No. 21-2319, 2023 WL 2375684 (2d Cir. Mar. 7, 2023); *see also United States v. Castillo*, No. 03 Cr. 979, 2023 WL 2262881, at *3 (S.D.N.Y. Feb. 28, 2023) (concluding that 65-year-old defendant with multiple serious medical issues, including an enlarged prostate, heart disease, and eye problems had not shown extraordinary and compelling reasons).

Further, Monsalvatge has not demonstrated that BOP cannot adequately address his medical needs. The Court's review of Monsalvatge's medical records indicate that BOP is managing and treating Monsalvatge's health conditions and therefore that he is receiving the appropriate medical care. Monsalvatge's assertion that the fecal occult blood test[3] is not an appropriate alternative to a colonoscopy is unavailing. Monsalvatge had a negative result for his fecal occult blood test, and he has not explained how a negative result warrants a colonoscopy or pointed to any other indicators in his health records that would warrant a colonoscopy. *See United States v. Pinon*, 2022 WL 16557620, at *2 (S.D. Cal. Oct. 31, 2022) (on motion for sentence reduction, finding no compelling and extraordinary circumstances warranting relief where defendant had a "positive occult blood stool test" and defense counsel "recognize[d] that a positive blood fecal test has many causes---some serious, some less serious" citing to medical sources); *see also United Sates v. Joseph*, 2021 WL 535375, at *3 (S.D. Fla. Feb. 11, 2021) (discussing where defendant receives regularly a fecal occult blood test which can be indicative of cancer).

---

[3]     A fecal occult blood test is a lab test used to check stool samples for hidden (occult) blood. Occult blood in the stool may indicate colon cancer or polyps in the colon or rectum. *See* https://www.mavoclinic.org/tests-procedures/fecal-occult-blood-test/about/pac-20394112. *See Ivy v. Wellpath*, 2023 WL 4565328, at *4 n.3 (W.D. Pa. July 17, 2023).

Finally, Monsalvatge argues that his time spent incarcerated during the Covid-19 pandemic constitutes an independent reason for the relief he seeks. Second Reduction Mot. at 6. While Monsalvatge may have experienced some difficulties in prison related to Covid-19, "everyone incarcerated at [BOP] facilities experienced the same conditions." *United States v. Crumble*, No. 18 Cr. 32(1) (ARR), 2021 WL 236003, at *4 (E.D.N.Y. Jan. 25, 2021); *see also United States v. Johnson*, 2021 WL 1207314, at *4 (E.D.N.Y. Mar. 31, 2021) (finding that COVID-19-related hardships "do not set [a defendant] apart from the rest of the BOP inmate population and therefore do not, alone, constitute extraordinary and compelling reasons for his release"); *United States v. Veliu*, 2022 WL 2484240, at *5 (E.D.N.Y. July 6, 2022); *United States v. Pinto-Thomaz*, 454 F. Supp. 3d 327, 329 (S.D.N.Y., 2020) (observing "it is hard to see how" the BOP's implementation of various protocols in attempting to contain the spread of COVID-19 "ma[d]e the situations of [defendants] 'extraordinary' in terms of the statutory requirement, for in these respects [the defendants] are no different from a host of other prisoners"). Monsalvatge does not argue that he suffered any other difficult conditions that was exacerbated by Covid-19, but rather, Monsalvatge simply asserts that he was incarcerated during the pandemic. And even if Monsalvatge had faced difficult conditions during the pandemic three years ago, he does not claim that he is currently suffering from such conditions. Thus, the restrictive conditions in prison facilities, without more, are insufficient to grant the relief here.

## 2. Monsalvatge's Mother's Health and his Role as her Sole Caregiver

The Sentencing Commission's applicable policy statement provides that "[t]he incapacitation of a parent when the defendant would be the only available caregiver for the parent" represents extraordinary and compelling circumstances. U.S.S.G. § 1B1.13(b)(3)(C). "The animating principle of the Family Circumstances category is that there exists an extraordinary and

14

compelling reason for release when the defendant has a close family member who is completely unable to care for himself or herself and for whom the defendant would be the only available caregiver." *United States v. Lisi*, 440 F. Supp. 3d 246, 252 (S.D.N.Y. 2020).

However, district courts in this circuit "generally require the defendant to 'provide several sources of evidence' that the defendant is, in fact, the only available caregiver." *United States v. Donato*, No. 95-CR-223, 2024 WL 1513646, at *9 (E.D.N.Y. Apr. 8, 2024) (quoting *United States v. Sharma*, No. 19-CR-24, 2023 WL 4305054, at *3 (E.D.N.Y. June 30, 2023)); *see also United States v. Lindsey*, No. 13-CR-271, 2021 WL 37688, at *3 (S.D.N.Y. Jan. 4, 2021) ("[C]ourts generally require a showing of "'evidence from several sources" indicating that the defendant "is the only available caregiver" for a family member in "dire conditions,'" before concluding that 'an extraordinary and compelling reason has been established.'" (quoting *United States v. Ayala*, No. 16-CR-809, 2020 WL 6626015, at *1 (S.D.N.Y. Nov. 12, 2020))).  For example, in *Lisi*, the defendant "his mother, and numerous others [ ] provided evidence to the Court indicating that [defendant's mother] [was] both incredibly unwell, and that whatever assistance she [was] receiving from home health aides [was] inadequate." 440 F. Supp. at 252.  In the court's view, there were ample sources "indicating that [the defendant] [as] the only available caregiver for his mother, due to both the apparent incompetence or neglect of her hired aides and her daughter's ([the defendant's] sister) either inability or complete aversion to helping her." *Id.*

Monsalvatge asserts that his mother "had a mass removed from her right breast, radiation treatment for six weeks for breast cancer, high blood pressure, and suffers occasionally from mental disorientation" and that there "is no one else that can assist her nor be her primary caregiver" except for him.  Second Reduction Mot. at 9.  Further, he asserts that "[his] mother is ill and that she has no other person besides [himself] that can provide her with the assistance that

she needs" and that "[t]here is no one else that can be [her] primary care provider." Affidavit of Monsalvatge ("Monsalvtge Aff."), ECF 296-1, at 1, ¶ 2. Monsalvatge filed a letter from his mother, in which she states that she is "75 years old and will be turning 76 in September" and that she has "had some health issues and [Monsalvatge] kept in contact through that time."[4] Second Reduction Mot. at 3. However, nowhere in the letter does his mother make any reference to suffering from an incapacitating illness, including those indicated by her son, or that her son would be her primary caregiver.

The only source of evidence before the Court that speaks to Monsalvatge's role as his mother's sole caregiver is his sworn affidavit. In his reply papers, Monsalvatge argues that his affidavit supports his assertions contrary to the Government's position that they are unsupported. Monsalvatge Reply at 6. While Monsalvatge is certainly correct that his declaration constitutes one source of support, it is simply just that—one source. The Court does not discredit that affidavit and has no reason to doubt its veracity—neither Monsalvatge's assertions regarding his mother's illness nor that he would be her only caregiver—and the Court is well aware of the implications of his mother's advanced age. But, absent any other corroborating evidence, *i.e.,* "several sources of evidence[,]" the Court cannot grant Monsalvatge the relief he seeks on the bleak record before it. *Donato*, 2024 WL 1513646, at *9.

### 3. Federal Time Credits

Federal Time Credits ("FTC") provides that an eligible prisoner may earn time credits if he successfully participates in certain evidence-based recidivism reduction programs or productive activities. *See* 18 U.S.C. § 3632(d)(4). The time credits are applied toward pre-release custody or

---

[4]   The Court notes that the screenshot of the letter did not capture the complete letter because it cut some parts of the right side of the page. Thus, the right end of each line sentence is not captured. However, because the screenshot captures a large part of the letter, the Court is sufficiently able to glean the substance of the letter.

supervised release.  *Id*. § 3632(d)(4)(C).  However, an inmate is not eligible to earn FTC time credits if he "is serving a sentence for a conviction" of certain enumerated offenses, including the unlawful possession or use of a firearm during and in relation to any crime of violence or drug trafficking crime under § 924(c).  *See id.* § 3632(d)(4)(D)(xxii).

Monsalvatge argues that he is entitled to a sentence reduction because BOP's refusal to apply to his sentence the FTC credits he accumulated constitutes an extraordinary and compelling reason.  Second Reduction Mot. at 10.  Relevant here and as stated above, Monsalvatge was charged, convicted, and sentenced under § 1951(a) (Hobbs Act robbery and conspiracy robbery) and § 924(c).  *Id.* at 11.  While Monsalvatge asserts that a person convicted under § 1951 is eligible to receive these FTC credits, he acknowledges that a person convicted under § 924(c) is ineligible. Monsalvatge requests that the 450 FTC credits be applied to the § 1951 counts (and none to the ineligible § 924(c) counts) because "[t]he Court at sentencing and resentencing issued separate sentences for the separate offenses."  Second Reduction Mot. at 11.  Further, Monsalvatge asserts that BOP fails to acknowledge this, which he argues constitutes a cognizable harm and that he "is left to suffer for it beyond what Congress intended."  *Id*.  The Government responds that the FTC program must be analyzed under the statutory scheme that includes BOP's obligation to aggregate sentences under § 3584(c).  Gov't Opp. at 3-4.

The Second Circuit recently addressed a similar issue regarding First Step Act ("FSA") credits in the context of a habeas corpus petition in *Giovinco v. Pullen*, 118 F.4th 527 (2d Cir. 2024).  There, defendant-appellant Giovinco was serving concurrent and consecutive sentences, one of which was for an offense ineligible for FSA time credits.  *Id.* at 530.  Giovinco sought to earn FSA time credits for the portion of his sentence for an offense eligible for FSA time credits. *Id.*  Giovinco argued that § 3632(d)(4)(D) rendered him ineligible to earn time credits only while

he was serving the individual sentence related to the ineligible offense, but that once he completed serving the maximum sentence for that offense, he would be eligible to earn FSA time credits for the remainder of his sentence because he would no longer be "serving a sentence for" an ineligible offense as defined by statute. *Id.* at 529. BOP responded that Giovinco was ineligible to earn FSA time credits for his entire aggregated term of imprisonment because 18 U.S.C. § 3584(c) applies to the BOP's administration of the FSA time credit program. *Id.* Applying the canon of statutory interpretation, the Second Circuit found that the aggregation provision under § 3584(c) "establishes a background principle according to which '[m]ultiple terms of imprisonment . . . shall be treated for administrative purposes as a single, aggregate term of imprisonment'" and that other courts have found that the "administrative purposes" referenced in § 3584(c) include BOP's administration of other types of sentencing credits. *Id.* at 531. The Second Circuit held that "BOP is charged with administering the FSA time credit program, and for that reason its implementation of § 3632(d)(4)(D) is an 'administrative purpose' for which multiple terms of imprisonment are to be treated as a single, aggregate term." *Id.* Further, "[i]n the context of the aggregation provision and precedent holding that the aggregation provision applies to other sentencing credit programs, the phrase 'is serving a sentence for' is best understood as referring to the prisoner's aggregate term of imprisonment." *Id.* at 532.

The facts and arguments made in *Giovinco* are analogous to those in the instant action. Monsalvatge was sentenced to consecutive terms of imprisonment, at least one of which is ineligible for time credits—the Hobbs Act robbery and conspiracy robbery under § 1951(a). Monsalvatge argues that the 450 earned time credits should apply to reduce his term of imprisonment related to his eligible offense—§ 924(c)—because doing otherwise, according to Monsalvatge, would be contrary to Congress' intent. Second Reduction Mot. at 11. The

18

Government responds that Monsalvatge's position "undermine[s] the statutory FTC scheme enacted by Congress" "[g]iven that the FTC scheme was created pursuant to the same statute—the FSA[.]" Gov't Opp. at 11.  The Government argues that it would be "illogical for Congress to have specifically excluded those defendants convicted under § 924(c) from the FTC program while . . . permitting that exclusion to form the basis of a successful application under 18 U.S.C. § 3582(c)." *Id.*

The Court agrees.  In its statutory interpretation, the court in *Giovinco* recognized that "Congress may establish a "background principle of interpretation" to guide courts in understanding subsequently enacted statutes." *Giovinco*, 118 F.4th at 531 (quoting *Everytown for Gun Safety Support Fund v. ATF*, 984 F.3d 30, 34 (2d Cir. 2020)).  Applying the holding from *Giovinco*, the Court also finds that the BOP is charged with administrating time credit programs under § 3632(d)(4) and as such multiple terms of imprisonment are to be treated as a single, aggregate term.  Monsalvatge is therefore not eligible to a sentence reduction on the basis for earned time credits for an eligible offense while serving a sentence for an illegible offense.

Consequently, Monsalvatge's accumulated 450 time credits do not constitute an extraordinary and compelling reason to reduce his sentence.

**4.      2023 Amendments to the U.S. Sentencing Guidelines**

Amendment 821 of the 2023 Amendments to the Sentencing Guidelines, effective November 1, 2023, applies retroactively.  *See* U.S.S.G. § 1B1.10(d); *see also United States v. Laporta*, 21-CR-445 (MKB), 2024 WL 1348691, at *1 (E.D.N.Y. Mar. 29, 2024) (noting that Amendment 821 applies retroactively).  Part A of the Amendment 821 "modified the calculation of 'status points' added to a defendant's criminal history score under U.S.S.G. § 4A1.1." *Laporta*, 2024 WL 1348691, at *2.  Previously, Section 4A1.1(d) instructed courts to: "Add 2 points if the

19

defendant committed the instant offense while under any criminal justice sentence, including probation, parole, supervised release, imprisonment, work release, or escape status." U.S. Sent'g Comm'n, Amendments to the Sentencing Guidelines, 88 Fed. Reg. 28,254, 28,270 (May 3, 2023). Amendment 821 eliminated subsection (d)'s "status points" provision, redesignated the prior subsection (e) as subsection (d), and inserted the following new subsection (e), which instructs that, in calculating a defendant's criminal history, courts must now: "Add 1 point if the defendant (1) receives 7 or more points under subsections (a) through (d), and (2) committed the instant offense while under any criminal justice sentence, including probation, parole, supervised release, imprisonment, work release, or escape status." *Id.*; U.S.S.G. § 4A1.1(e). Thus, Amendment 821 "removed the status points assessed to defendants with six or fewer criminal history points . . . ." *United States v. Budovsky*, 2024 WL 1676337, at *2 (S.D.N.Y. Apr. 18, 2024).

Part B of Amendment 821 added Section 4C1.1 to Chapter 4 of the Guidelines, which provides for a two-point reduction in offense level for so-called "zero-point offenders"— individuals who received no criminal history points at their sentencing under Chapter 3 of the Guidelines—and whose offense did not meet any of the exclusionary criteria. U.S.S.G. § 4C1.1(a)(1)–(10); *see also United States v. Ali*, No. 21-CR-613, 2024 WL 515244, at *1–2 (S.D.N.Y. Feb. 9, 2024) (granting resentencing under section 4C1.1 because the defendant "did not receive any criminal history points at the original resentencing and ... defendant's offense did not include any of the (nine) exclusionary criteria listed in [s]ection 4C1.1(a)").

Thus, to be eligible for a sentence reduction under Part B of Amendment 821, a defendant must meet all of the following criteria:

(1) the defendant did not receive any criminal history points from Chapter Four, Part A;
(2) the defendant did not receive an adjustment under § 3A1.4 (Terrorism);

20

(3) the defendant did not use violence or credible threats of violence in connection with the offense;

(4) the offense did not result in death or serious bodily injury;

(5) the instant offense of conviction is not a sex offense;

(6) the defendant did not personally cause substantial financial hardship;

(7) the defendant did not possess, receive, purchase, transport, transfer, sell, or otherwise dispose of a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;

(8) the instant offense of conviction is not covered by § 2H1.1 (Offenses Involving Individual Rights);

(9) the defendant did not receive an adjustment under § 3A1.1 (Hate Crime Motivation or Vulnerable Victim) or § 3A1.5 (Serious Human Rights Offense); and

(10) the defendant did not receive an adjustment under § 3B1.1 (Aggravating Role); and

(11) the defendant was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. 848 ....

U.S.S.G. § 4C1.1.

Because Monsalvatge did not commit the instant offenses while under a criminal justice sentence and that his prior criminal conviction "result[ed] in no criminal history points" resulting in a c criminal history category of I, PSR ¶ 65, he did not receive additional points under the prior version of Section 4A.1.(d). *See id.* Therefore, Monsalvatge does not qualify for relief under Part A of Amendment 821.

Monsalvatge is also not eligible for a sentence reduction under Part B of Amendment 821. Monsalvatge did not receive any criminal history points and therefore satisfies the first requirement of Part B of Amendment 821. However, Monsalvatge "brandished a firearm" and "rested a gun on the countertop so that it was pointed at [teller] and said 'do not make any move' and 'I'll kill you" during the 2010 robbery. PSR ¶ 9. During the 2012 robbery, Monsalvatge and the other defendants impersonated NYPD officers and "showed [teller 1] a picture of her house (to let her know they knew where she lived) and used her to convince teller 2 to open the door to the check cashing store." PSR ¶ 12. Because Monsalvatge made credible threats of violence and possessed a firearm during the commission of both robberies, Monsalvatge does not meet all the criteria

21

under § 4C1.1(a) for relief under Part B to receive a two-level reduction in offense levels in connection with Part B of the Amendment. *See United States v. Ewing*, S6 14 CR 604-1 (VB), 2024 WL 1250685, at *1 (S.D.N.Y. Mar. 21, 2024) (noting that a defendant did not qualify for a sentence reduction under Part B of Amendment 821 where he "used violence or credible threats of violence in connection with the offense, the offense resulted in death or serious bodily injury, and he possessed a firearm in connection with the offense" (citing U.S.S.G. § 4C1.1(a)(3), (a)(4), (a)(7))); *see United States v. Prescod*, 2024 WL 3758820, at *3 (E.D.N.Y. Aug. 12, 2024) (finding that a defendant did not qualify for relief under Part B where the aggravating factors listed in US.S.G. § 4C1.1(a) were present).

Consequently, Monsalvatge is ineligible for a sentence reduction based on the 2023 Amendments to the Sentencing Guidelines, and his sentence remains unaffected by these amendments. *Ewing*, 2024 WL 1250685, at *1 (denying motion where defendant failed to meet eligibility criteria under Parts A and B of Amendment 821).

### 5.    Rehabilitation and Remorse

Monsalvatge argues that his sentence should be reduced based on "his commitment to rehabilitation and dramatic character change." Second Reduction Mot. at 19. "The Second Circuit has acknowledged that while rehabilitation 'alone' does not constitute an 'extraordinary and compelling reason,' courts may consider it as a factor in determining if there are extraordinary and compelling reasons for compassionate release*." United States v. Qadar*, No. 00-CR-603 (ARR), 2021 WL 3087956, at *10 (E.D.N.Y. July 22, 2021) (quoting *Brooker*, 976 F.3d at 238). Courts have broad discretion to determine what constitutes "rehabilitation." As to guidance for evaluating rehabilitation, the Court finds the late Judge Weinstein's sentencing analysis in *United States v. Blake* both rigorous and enlightening. *See* 89 F. Supp. 2d 328, 340-48 (E.D.N.Y. 2000). In *Blake*,

Judge Weinstein squarely addressed the question of "What is Rehabilitation?" by tracing the history and moral underpinnings of the rehabilitative model of incarceration. While the Court need not repeat all of *Blake*'s insights, it does agree that, at minimum, "rehabilitation requires the court to examine whether a defendant has taken responsibility for his or her actions and acted to reintegrate oneself into a productive society." *Id.* at 346. Courts in this district have also considered the following factors: the movant's maintenance of familial and societal relationships; letters of support both from community members and prison staff; conduct and disciplinary records while incarcerated; and any achievements and education obtained while incarcerated. *See, e.g., Qadar*, 2021 WL 3087956, at *10; *Watts*, 2023 WL 35029, at *12-14; *United States v. Facey*, No. 96-CR-912 (ERK), 2021 WL 3117439, at *2 (E.D.N.Y. July 20, 2021). Courts also note that gains in "maturity" and other "clear signs that [a defendant's] incarceration has had rehabilitative value[.]" *Birkett*, 2023 WL 4274683, at *6.

Two years ago, in granting Monsalvatge's first motion for sentence reduction, Judge Dearie found that Monsalvatge "ha[d] undergone substantial rehabilitation over the past decade." Reduction Order at 7-8. Specifically, Judge Dearie found that:

> [Monsalvatge] ha[d] improved himself through education, successfully completing eight courses over the last seven years, including most significantly a 363-hour-long course in Alcoholism & Substance Studies that trained him to give back to his community as a peer drug counselor. *See* ECF No. 274 at 21. He also served as a suicide watch and mental health companion, for which he was recognized for supporting his peers "through their darkest moments." *Id.* at 25. "Monsalvatge [] worked consistently as an orderly during his incarceration and has remained incident-free since 2014. ECF No. 280 at 32-33.

Reduction Order at 7-8. Judge Dearie also discussed Monsalvatge's expression of remorse for the crimes committed:

> Monsalvatge acknowledges the harm he caused the victims of his crimes and apologizes forthrightly to those victims and to the members of law enforcement who prosecuted his case. *See* ECF No. 280 at 1. He also writes candidly about the

23

remorse he feels for his family — most importantly, his two daughters — and for the price they have paid for his crimes." *Id.* Monsalvatge recognizes that he "made selfish choices" and the Court credits his account of "deep[] regret" over these choices "each and every day." *Id.* at 2.

Reduction Order, at 7. Judge Dearie concluded that extraordinary and compelling circumstances were present and warranted sentencing relief from 32 years and 1 day to 17 years.

Today—two years after Judge Dearie's order—Monsalvatge asserts that, even after resentencing, he has continued his rehabilitative efforts, he has a low risk of recidivism, and he is no longer a threat to public safety. Second Reduction Mot. at 17-19. He continues to express remorse, stating that "there is no doubt that [he] made some poor choices in his life" and that "it is clear he should have gone to prison for a significant amount of time." *Id.* at 18, 21. Since his resentencing, Monsalvatge has successfully completed an inmate suicide watch companion program, ECF 299, continues to improve himself through education and consistent work and has had zero incidents, ECF 200. These records demonstrate that Monsalvatge continues to live an exemplary life as an incarcerated person. However, because the Court does not find other extraordinary and compelling circumstances warranting reduction in sentence, his rehabilitation efforts—while commendable—*alone* are insufficient basis to justify a sentence reduction.

### C. 3353(a) factors

Given Monsalvatge has not shown that extraordinary and compelling circumstances exist and does not qualify for relief under Amendment 821, Monsalvatge is ineligible for a sentence reduction to time served or probation. Thus, the Court need not analyze the factors under 18 U.S.C. § 3553(a). *See United States v. Garcia*, 2024 WL 532447, at *2 (S.D.N.Y. Feb. 9, 2024); *see also Ross*, 2024 WL 149130, at *2 (declining to analyze Section 3353(a) factors where criminal history calculation alone established that defendant was ineligible for a sentence reduction); *United States v. Zafar*, No. 19-CR-385-JMA-ST-2, 2024 WL 2158186, at *2 (E.D.N.Y. May 14, 2024).

**CONCLUSION**

For the foregoing reasons, Monsalvatge's motion is denied.

SO ORDERED.

/s/
ORELIA E. MERCHANT
United States District Judge

January 27, 2025
Brooklyn, New York